Filed:  December 19, 2005

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT
_____

No. 04-2492
(CA-03-2323; BK-00-10432)
_____


In Re:  CHARCO, INCORPORATED,

                                                      Debtor.

----------------------------------

BRENDA CLYDETTE DOVE COLLIER,

                                   Plaintiff - Appellant,

          versus

UNITED STATES OF AMERICA, by and through the
Internal Revenue Service,

                                   Defendant - Appellee.


─────────────────
O R D E R
─────────────────

     The court amends its opinion filed December 13, 2005, as
follows:

     On page 14, first line -- the word "that" is added between the
words "than" and "the courts."

                              For the Court - By Direction


                              __/s/ Patricia S. Connor__

                              Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: CHARCO, INCORPORATED,
                            *Debtor.*

---

BRENDA CLYDETTE DOVE COLLIER,
                  *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA, by and
through the Internal Revenue
Service,
                  *Defendant-Appellee.*

No. 04-2492

Appeal from the United States District Court
for the Southern District of West Virginia, at Bluefield.
David A. Faber, Chief District Judge.
(CA-03-2323; BK-00-10432)

Argued: September 19, 2005

Decided: December 13, 2005

Before NIEMEYER and LUTTIG, Circuit Judges, and
Robert J. CONRAD, Jr., United States District Judge
for the Western District of North Carolina,
sitting by designation.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Conrad joined. Judge Luttig wrote a dissenting opin-
ion.

**COUNSEL**

**ARGUED:** Cheryl Lynne Connelly, CAMPBELL, WOODS, BAG-LEY, EMERSON, MCNEER & HERNDON, Huntington, West Virginia, for Appellant. Mary Roccapriore Pelletier, UNITED STATES DEPARTMENT OF JUSTICE, Tax Division, Washington, D.C., for Appellee. **ON BRIEF:** Harry F. Bosen, Jr., Salem, Virginia; Charles I. Jones, Jr., CAMPBELL, WOODS, BAGLEY, EMERSON, MCNEER & HERNDON, Charleston, West Virginia, for Appellant. Kasey Warner, United States Attorney, Eileen J. O'Connor, Assistant Attorney General, David I. Pincus, UNITED STATES DEPART-MENT OF JUSTICE, Tax Division, Washington, D.C., for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

Brenda Clydette Dove Collier and the Internal Revenue Service ("IRS"), the parties to the adversary proceeding on appeal, have each filed a secured claim against Charco, Inc., d/b/a Dove Signs, the debtor in this Chapter 7 bankruptcy proceeding. We now decide which claim has priority in the limited funds that remain in the bankruptcy estate.

Collier obtained a $121,500 judgment in a Virginia court against the debtor and filed it in West Virginia *before* the IRS recorded its $82,000 tax lien against the debtor, but she recorded her judgment in West Virginia *after* the tax lien was recorded. Even though, under West Virginia law, Collier obtained a lien on the debtor's real property when she obtained her judgment in West Virginia against the debtor, under federal law an IRS tax lien still takes priority over an unrecorded judgment lien "[i]f recording or docketing is necessary under local law before a judgment becomes effective against third parties acquiring liens on real property." 26 C.F.R. ("Treasury Regulation") § 301.6323(h)-1(g). West Virginia law requires recordation for a judgment to become "good as against" deed-of-trust creditors, one class of third-party lienors, even though recordation is not required before a judgment becomes good as against other third-party lienors.

Construing Treasury Regulation 301.6323(h)-1(g), we hold that the Regulation gives the United States' tax lien priority over Collier's unrecorded West Virginia judgment lien. Even though Collier recorded her judgment lien, she did so after the IRS had recorded the tax lien. Accordingly, we affirm the district court's judgment denying Collier lien priority.

I

On June 10, 1996, the IRS assessed $18,227.56 in unpaid taxes against Charco, Inc. ("Charco"), of Princeton, West Virginia, and on September 16, 1996, another $63,847.15. It then recorded a combined tax lien of $82,074.71 on November 26, 1996, in the Mercer County (West Virginia) Commission Clerk's Office because Charco's real property was located in Mercer County.

Collier obtained a judgment against Charco in Roanoke County (Virginia) Circuit Court on September 19, 1996, in the amount of $121,500 plus interest and costs. To enforce that judgment in West Virginia against Charco's real property, Collier filed the judgment in the Mercer County Circuit Court on October 21, 1996, pursuant to the Uniform Enforcement of Foreign Judgments Act, W. Va. Code § 55-14-2, which provides that a "judgment so filed has the same effect and is subject to the same procedures, defenses and proceedings for reopening, vacating or staying as a judgment of a circuit court of this state and may be enforced or satisfied in like manner." She recorded her judgment with the Mercer County Commission Clerk's Office on January 23, 1997.

Thus, Collier obtained judgment in West Virginia against Charco before the IRS recorded the United States' tax lien, but she recorded her judgment after the IRS had recorded the tax lien.

In September 2000, creditors of Charco placed it in involuntary bankruptcy under Chapter 7 of the Bankruptcy Code. During the proceedings, both the IRS and Collier filed proofs of secured claims — the IRS for the United States, in the amount of $254,880.92; and Collier, in the amount of $172,954.12. The proceeds from the sale of Charco's real property during the bankruptcy proceedings amounted

to only $96,275.84 after deducting administrative costs and attorneys fees.

Collier commenced this adversary proceeding in the bankruptcy case against the United States "by and through" the IRS, seeking a declaratory judgment that her judgment lien had priority over the United States' tax lien with respect to the remaining funds in the bankruptcy estate. The bankruptcy court ruled that the United States' tax lien had priority, and the district court affirmed. Both courts reasoned that Collier's judgment lien had not been "perfected," as federal regulations define the term, until Collier recorded it in January 1997. This appeal followed.

## II

Collier contends that when she filed her Virginia judgment against Charco in West Virginia on October 21, 1996, she "perfected" a lien against Charco's real property pursuant to West Virginia Code § 38-3-6, which provides in part that "[e]very judgment for money rendered in this State . . . shall be a lien on all the real estate" of the defendant within the State. Believing she had "perfected" her lien against Charco's property before the IRS recorded its lien, she asserts priority in the remaining funds in Charco's bankruptcy estate.

The IRS contends that Collier did not "perfect" her judgment lien until she recorded it in January 1997 and that the IRS has priority because it recorded its tax lien in November 1996.

The priority of federal tax liens as against competing liens asserted against a taxpayer's property is governed by federal law. *Aquilino v. United States*, 363 U.S. 509, 514 (1960).

The Internal Revenue Code provides that the amount of assessed tax, interest, and penalty not paid by a person after demand becomes a lien in favor of the United States "upon all property and rights to property" belonging to the person. 26 U.S.C. § 6321. The lien "arise[s] at the time the assessment is made." *Id.* § 6322. But it is not "valid as against any purchaser, holder of a security interest, mechanic's lienor, or *judgment lien creditor*" until it is recorded locally. *Id.*

§ 6323 (emphasis added). The priority between a recorded tax lien and a judgment lien is governed by the rule of "first in time, first in right." *United States v. Pioneer Am. Ins. Co.*, 374 U.S. 84, 87 (1963); *see also United States v. Equitable Life Assurance Soc'y of the United States*, 384 U.S. 323, 327-28 (1966); *Air Power, Inc. v. United States*, 741 F.2d 53, 55 (4th Cir. 1984). But before a judgment lienholder can have priority over tax lien, she must be a "judgment lien creditor" as that term is used in 26 U.S.C. § 6323.

As used in § 6323, "judgment lien creditor" is defined by Treasury Regulation 301.6323(h)-1(g) as "a person who has obtained a valid judgment, in a court of record and of competent jurisdiction, for the recovery of specifically designated property or for a certain sum of money," and who "has *perfected* a lien under the judgment on the property involved." 26 C.F.R. § 301.6323(h)-1(g) (emphasis added).

In this case, Collier contends that she perfected her lien on Charco's property on October 21, 1996, when she domesticated her Virginia judgment by filing it in Mercer County, West Virginia. She argues therefore that her lien was valid against the IRS' subsequently filed tax lien. Even though Collier did not record her judgment until January 1997 — after the IRS had recorded its tax lien — she argues that recordation was not required under West Virginia law to perfect her lien. She relies on West Virginia Code § 38-3-6, which provides in part that "every judgment for money rendered in this State . . . shall be a lien on all the real estate of [the defendant]."

It is federal law, however, not state law, that defines when a judgment lien is "perfected":

> A judgment lien is not perfected until the identity of the lienor, the property subject to the lien, and the amount of the lien are established. . . . *If recording or docketing is necessary under local law before a judgment becomes effective against third parties acquiring liens on real property, a judgment lien under such local law is not perfected with respect to real property until the time of such recordation or docketing. . . .*

26 C.F.R. § 301.6323(h)-1(g) (emphasis added). Thus, before a judgment lien is perfected, a judgment lienor must (1) identify the lienor,

(2) identify the property subject to the lien, (3) identify the amount of the lien, and (4) record the lien "[i]f recording or docketing is necessary under local law before a judgment becomes effective against third parties acquiring liens on real property." *Id.* The determinative question in this case is whether Collier had to record her judgment lien in order to perfect it, which depends on whether recording is required by local law "before a judgment becomes effective *against third parties acquiring liens on real property*." *Id.* (emphasis added).

At oral argument counsel for the parties debated whether it was more natural to read "third parties acquiring liens on real property" as "*any* third party acquiring liens on real property" or as "*all* third parties acquiring liens on real property." Neither position, however, captures precisely the clause's meaning.[1] Ordinarily, an unmodified plural is used to describe a class of objects. For instance, a person who claims "to enjoy eating apples" does not necessarily claim to enjoy eating *all* apples. She very well might dislike overripe apples, or she might never have tried Granny Smith apples. For these reasons, she might not be satisfied if a friend just gave her *any* apple to eat. When she declares that she "enjoys eating apples," she simply communicates that there exists a class of apples that she likes to eat. And if there are apples that she in fact enjoys, the claim about enjoying apples is an accurate one even if it does not include all apples.

Likewise, ordinary language analysis does not permit us to cabin "third parties acquiring liens on real property" with the limiting terms "one," "any," "some," or "all." These terms were not used in the Treasury Regulation, and we conclude deliberately so. The choice not to use such terms is justified with respect to — not because of — the regulatory background within which the Regulation operates. States have independent authority to create liens and to regulate how they become effective against others. Given the variations in state laws, it would have been impractical, if not impossible, for the regulation to have cataloged each type of third-party lienor against which a judgment in each State would have to "become effective" before it could

---

[1]Our dissenting colleague resorts to the same analysis, refusing to accept the text as written. The entire analysis of the dissent presupposes that the statutory reference to "third parties acquiring liens on real property" must mean either "*all* third parties" or "*one* third party."

have been perfected vis-à-vis a federal tax lien. Moreover, the class label accommodates changes in state lien laws without requiring a change in the regulation for each change in state law. In this case, therefore, we conclude that the use of an unmodified plural, "third parties," identifies a class, the content of which varies with local lien laws.[2]

Thus, we read the federal regulation to state that, to be considered a "judgment lien creditor" with priority over a federal tax lien, the creditor must perfect her judgment lien by recording it if a state has identified a class of third parties acquiring liens against whom a judgment is ineffective until it is recorded. Such a class of third parties need not include every possible third party acquiring a lien, for the federal regulation does not require recording only if state law requires recording against any or all third parties. Rather, the regulation requires recording against a class of third parties acquiring liens, no matter how many third party lienors are part of the state-defined class. Because we conclude that West Virginia law creates just such a class of third parties against whom a judgment creditor must record her judgment lien, we hold that a judgment lien creditor in West Virginia must record her judgment lien to be valid against a recorded federal tax lien.

In West Virginia, every judgment becomes a lien on real property at the date of judgment, W. Va. Code § 38-3-6, but those judgments are not liens against bona fide purchasers until they are recorded, W.

---

[2]The dissent's conclusion that "third parties" means "*all* third parties" is driven by its fear that our interpretation requires recording even if a State's class of third parties acquiring liens on real property has but one member. This outcome is untenable to the dissent because the entirety of the dissent's analysis rests on a false dichotomy that "third parties" must mean either "*all* third parties" or "*one* third party," the latter of which undercuts the drafter's use of the plural. Yet plurality is not only a matter of quantity, for, as we have shown, a plural word in common usage serves when a quantity is unknown. It is conceivable that in a given case, the class of third parties acquiring liens on real property is made up of 0, 1, 10, 100, or "all" third parties acquiring liens on real property in a given State. But the actual quantity has no bearing on our interpretation of this regulation, which is a regulation that assigns rights and obligations *before* a given case event comes to court.

Va. Code § 38-3-7. Although bona fide purchasers are third parties, they are not specifically third parties *acquiring liens on real property*, so this class would not be a class of third parties that fulfills the condition of the Treasury Regulation. But the West Virginia Supreme Court has extended § 38-3-7 to apply also to deed-of-trust creditors, and deed-of-trust creditors, who essentially are mortgagees, are indeed third parties acquiring liens on real property. *See Cooper v. Cooper*, 98 S.E.2d 769, 772 (W. Va. 1957); *Amato v. Hall*, 174 S.E. 686, 687 (W. Va. 1934); *Weinberg v. Rempe*, 15 W. Va. 829, 858 (1879).

In sum, West Virginia law identifies two distinct classes of third parties acquiring liens on real property — deed-of-trust creditors and everyone else. Although a West Virginia judgment is effective against the class of "everyone else" whether or not it is recorded, it is not effective against the class of "deed-of-trust creditors" unless recorded. Thus, recording is necessary under West Virginia law before a West Virginia judgment becomes effective against a class of third parties acquiring liens — deed-of-trust creditors — and the condition of the Treasury Regulation, therefore, is fulfilled. Collier accordingly would have to record her judgment lien in order to perfect it under federal law.

Although Congress could have retained absolute priority under the common law "first in time, first in right" rule, it was satisfied to have the IRS be treated no better *and* no worse than other third-party lienors under state law. *Cf. United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 738 (1979) (observing that, in passing 26 U.S.C. § 6323, Congress "recognized the priority of many state claims over federal tax liens"). We note that our statutory interpretation in effect agrees with that of the Eleventh Circuit, which concluded, when interpreting other regulations promulgated under § 6323, that the regulations essentially grant the IRS "most favored nation" status so that it receives the best possible priority the state law would provide to a third-party lienor. *See In re Haas*, 31 F.3d 1081, 1089 (11th Cir. 1994) (concluding that the Treasury Regulation "operates to the put the IRS in the shoes of *any* subsequent judgment creditor, including the most favorable shoes").[3]

---

[3]Our citation to *In re Haas* highlights a decision of the Eleventh Circuit in which it relied on the contextual reasoning of the IRS Regulations

At bottom, we hold that if a State requires that a judgment be recorded before it is effective against a class of third parties acquiring liens on real property, an unrecorded judgment in the State is not, under the Treasury Regulation, effective against a recorded federal tax lien. Because West Virginia law does require recordation for a judgment lien to be valid against a class of third parties acquiring liens on real property — i.e., deed-of-trust creditors — the federal regulation requires Collier to record her judgment lien to be valid against a federal tax lien. Thus, Collier's judgment lien obtained before the IRS recorded its federal tax lien was ineffective against the tax lien until it was recorded, and because it was recorded after the tax lien was recorded, the IRS lien has priority over Collier's. Accordingly, the judgment of the district court is

*AFFIRMED*.

LUTTIG, Circuit Judge, dissenting:

I have no idea what the Treasury Department intended when it promulgated the regulation that is before us today. However, whatever its intent, I suspect the Department drafted the regulation against a background belief that state recordation laws do not generally distinguish among third-party creditors. But whether or not this was its belief, I am confident as to the most defensible reading of the language that the Department chose to effectuate whatever its intent was (and, incidentally or not, that reading is consistent with what I suspect was the Department's background belief).

---

to point out that the IRS would not, in adopting a recordation requirement, place itself in an inferior position with respect to the priority of liens when carrying out the task of collecting taxes. Contrary to what is suggested by the dissent, however, this reference does not drive our interpretation; rather it is cited to note that the result of our textual analysis is in conformity with a similar result reached by the Eleventh Circuit. Thus, the dissent incorrectly reads our opinion to say that we proceeded from the speculation of an IRS intent "without any regard for the text." Of course, our holding is grounded entirely on an interpretation of the text, unmodified by the addition of words such as "all," "any," and "some."

I am confident that when the regulation states that a judgment must be recorded if "third parties" must record, it is most plausibly read, absent any contextual evidence to the contrary (as here), to mean that judgment lien creditors in the state must record their judgments only if the state requires that a judgment be recorded before it is effective against *all* third-party creditors. Not just one third-party creditor. Not just some third-party creditors. And not just some unspecified, substantial class of third-party creditors. *All third-party creditors*. Indeed, this may well be the only even arguably plausible interpretation of the actual language of the regulation.

The want to interpret the regulation contrary to its language most naturally read is prompted, I believe, by nothing more than the discomfort of uncertainty that is felt when one is faced with state law, like that in West Virginia, that simply happens to be more nuanced than I suspect the Department realized existed at the time it promulgated the regulation. This is a want to which it is particularly inappropriate for a court to yield, however, because to do so results not in an interpretation, but in a rewriting, of the regulation's language.

The alternative interpretations to the one I would place upon the regulation, including the one embraced by the majority, are informed by rank speculation as to the Department's possible intent. And, to no surprise, these interpretations require constructions of the regulatory language that the language cannot even possibly bear.

The majority's interpretation of the regulation is a perfect example. The majority asserts that the purpose of the IRS regulation must have been to ensure that the IRS was always the equal of the "most favored" third party creditor in a given state, *ante* at 8 — an assertion for which the majority does not offer even a hint of evidence. Based upon nothing more than this pure speculation, and without any regard for the text of the regulation, the majority proceeds directly to hold that the regulation must mean that if a state requires that a judgment be recorded before it is effective against *any one third-party creditor*, then judgment lien creditors in the state must record their judgments before their liens are perfected — the interpretation that would best effectuate that assumed purpose. The majority cloaks this holding in formulation that is comforting to the casual reader (and no doubt to the majority as well) because it masks the difficult interpretive ques-

tion. The majority states that recordation is required when state law requires any "class" of third parties to record. But its holding that such a "class" may consist of but a single individual could not be clearer: "[T]he regulation requires recording against a class of third parties acquiring liens, *no matter how many third party lienors are part of the state-defined class*." *See ante* at 7 (emphasis added).

Whatever else the regulation means, it cannot possibly mean this. At a bare minimum, given that the regulation refers to "third part*ies*" in the plural, there must at least be two third parties who are required to record under state law in order for recordation of a judgment to be needed. Contrary to the majority's holding, surely it cannot suffice if but one part*y* is required under state law to record. But if "two" are needed, then why "two" instead of "ten." If "ten," then why "ten" instead of "a substantial number." If "a substantial number," then why "a substantial number" instead of "a majority." And if "a majority," then why not "the vast number." There is simply no basis in law for choosing any one of these over the other. No basis in the text of the regulation. No basis in its structure or context. Not even a basis in what the majority assumes to have been the regulation's purpose.

I am perfectly content to support the ordinary meaning interpretation that I would give the regulation by appeal to the analogy of the apple connoisseur (though I must confess to being baffled over the majority's invocation of this analogy in support of *its* interpretation). If one says "I like apples," and he is to be understood as having said *either* that "I like *all* apples" or that "I like *one* apple," he is most naturally understood to have said that he likes all apples — at least if language is to have any meaning beyond what one of us chooses to say it means. Which is to say that, at least in ordinary language, when an "unmodified plural" is used and there is no other adjectival language of limitation or contextual evidence suggesting to the contrary, the qualifier "all" is implicit. In other words, under these circumstances, it is incumbent upon the speaker to qualify the phrase in the event he wants to communicate something *less*.

Indeed, the majority itself appears to accept this fact of ordinary understanding (though it may not realize it) when it protests that one who claims to enjoy eating apples does not *necessarily* claim to enjoy eating all apples; if the majority did not itself believe that a claim to

like apples is better understood as a claim to like all apples, then it *almost certainly* would not have felt the need to draw out this strictly logical, but ultimately irrelevant, fact. And it *most certainly* would not have drawn it out as to "all" but not as to "any."

Of course it is true that to claim that one likes apples is not *necessarily* to claim enjoyment of all apples. But the question is not whether the apple eater has necessarily claimed to like all apples or claimed to like only one apple; the question, rather, is whether he is *better understood* to have claimed to like all apples or to have claimed like for merely one apple. The answer to this question is so obvious as not to require statement — as, again, it would appear even the majority would be obliged to concede.

No doubt recognizing that as between the conclusion that the apple connoisseur's claim refers to all apples and the conclusion that it refers possibly only to one apple, the better is the former, the majority reformulates, and thereby misformulates, the question presented as one of whether the connoisseur's claim is better understood as one to like all apples or only as one to like some unspecified class of apples. That is (returning to the regulation), the majority recasts the question as whether the regulation is better understood as requiring that all third parties record or only that some unspecified class of third parties record, in order for recordation of a judgment to be needed. The majority had seemed to flirt with this question at oral argument, though it had itself acknowledged that to answer such a question in the context of the instant regulation would invite resort to something like the "Platonic form" (rather than customary rules of judicial interpretation). *See* Transcript of Oral Argument (Sept. 19, 2005). Apparently underestimating the ultimate appeal of the "Platonic form," I had not believed that at the end of the day the majority would actually find itself drawn to precisely this view of the presented question, and, in pursuit of the answer to this question, even to the "Platonic form" of interpretation that it acknowledged such a view of the question would invite.

Nonetheless, having decided to accept its own invitation to resort to the "Platonic form" (whatever that is in the context of judicial interpretation), the majority fares no better than under the more traditional modes of interpretation heretofore employed by the courts. For, with

the question so framed, the ultimate vulnerability of the majority's interpretation of the regulation is only more clearly exposed: There is absolutely no basis at all in the regulatory text for concluding that the Treasury Department intended to require recordation whenever state law required any unspecified *class* of third parties to record. At the risk of repetition, if "two" are needed, then why "two" instead of "ten." If "ten," then why "ten" instead of "a substantial number." If "a substantial number," then why "a substantial number" instead of "a majority." If "a majority," then why not "the vast number." And, of course the hardest question for the majority, if any of these, then why not "all" — the one among the alternatives that is supported by the actual language of the regulation.

If the Department had intended such a rule as the majority settles upon, we simply would not have had before us the language that we do. If the Treasury Department had intended to require recordation of a judgment if any class of third parties were obliged to record — even a class of one — not only is it obvious that it would have written the regulation *differently than it did*, but it borders on the incredible to believe that it would have written the regulation *as it did*.

In sum, as would be expected of that which has as its object the ideal rather than the actual or the real, the "Platonic form" has yielded up for the majority an interpretation that produces what is sensed to be the ideal for which resort to "the Form" was made, but, alas, it is an interpretation that is able to claim no support whatsoever in that which is of the actual — that with which we as judges are to be concerned.

Because the majority appears to believe itself forced to its interpretation by what it perceives to be the unintended and unacceptable consequences of my interpretation, I should finally, perhaps, address myself to those consequences at least to say that I am not troubled at all about those that would appear to follow from the straightforward reading of the regulation, and even if I were, I would not yield to a troubled mind in this circumstance. To read the regulation as it is written does not, in any sense that I can discern, produce an absurd result. In fact, it would appear to produce a perfectly reasonable one. However, if perchance it is not the result intended or wished, the Department can simply amend the regulation forthwith. And far better

that than that the courts persist in all manner of linguistic contortion in effort to give judicial imprimatur to what it is only guessed to have been the intention of those who promulgated the regulation that is the source of our conjecture.

Were it the case that I disagreed with some parts of the majority's opinion, but agreed with others, I believe it would be incumbent upon me to say more than simply that "I dissent." However, given that I disagree not merely with some of the majority's opinion but with the whole of that opinion, I do not believe that more is required of me to be said. I am, in other words, satisfied that none will misunderstand the statement "I dissent" to mean that while I dissent from some parts of my colleagues' opinion, I concur in the remainder of the parts. Except perhaps those for whom the "Platonic form" is irresistible temptation.